UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**Daniel Cirilla,**
        **Plaintiff,**

                                vs.                             05-2030

**Kankakee County Jail, et al.,**
        **Defendants.**

**ORDER**

Before the court is the defendants' unopposed[1] summary judgment motion, d/e 32.

**Standard**

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[1] USDC CDIL Local Rule 7.1(D)(2) provides that a failure to respond shall be deemed an admission of the motion.

party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988).  A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Disputed facts are material only if they might affect the outcome of the suit.  *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).  "Summary judgment is not a discretionary remedy.  If the plaintiff lacks enough evidence, summary judgement must be granted." *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994).

## Background

The plaintiff, Daniel Cirilla has brought a civil rights complaints pursuant to 42 U. S. C. § 1983 against five defendants, including Kankakee County Chief of Corrections Michael Downey and four corporal or correctional officers, Barb Dyer (sued as Dyer), Carol Curwick (sued as Curwick), Jessie Rodriguez (sued as Mr. Rodriguez) and Todd Schloendorf.  The plaintiff claims that he was assaulted five times between June 30 and July 22, 2003.  He claims that the defendants failed to prevent the beatings and they failed to ensure that he receive appropriate medical care.

The plaintiff alleges the defendants violated the plaintiff's due process rights when they, with deliberate indifference, failed to protect the plaintiff from being assaulted by other pre-trial detainees on several occasions and failed to provide him with immediate medical care.

## Undisputed Material Facts[2]

1. The plaintiff, Daniel Cirilla is an inmate currently incarcerated at the Taylorville Correctional Center and has been at Taylorville since September 2005 (Ex. 1-Deposition of Plaintiff, p. 5).  Before that time, the plaintiff was an inmate for 1-1/2 years at the Pinckneyville Correctional Center.
2. Between June 30, 2003 and January 29, 2004, the plaintiff was incarcerated at the Kankakee County Jail as a pre-trial detainee (Ex. 1, p. 6; Comp. ¶¶ 5, 11).
3. At all relevant times, defendant Michael Downey was the Chief of Corrections for the Kankakee County Jail (Defendants' Answer to Complaint ¶ 6, d/e 23).
4. At all relevant times, defendants Barb Dyer, Carol Curwick, Jessie Rodriquez, and Todd Schloendorf were correctional officers employed by Kankakee County (Defendants' Answer to Complaint ¶¶ 7-10).
5. On June 30, 2003, the plaintiff was arrested by Kankakee City police. (Comp. ¶ 19, Ex. 1, p. 6).
6. After being booked and processed at the Kankakee County Jail, the plaintiff was placed

---

[2]All exhibits are submitted by the defendants, alongwith their Statement of Undisputed Facts filed in support of their summary judgment motion.  *See* d/e 34 to view Exhibits 1 - 12.  *See* d/e 6 to view the plaintiff's complaint.

in the jail's "drunk tank" (Ex. 1, pp. 6-8). The plaintiff remained housed there for approximately 22 days (from June 30, 2003 until July 22, 2003), after which time the plaintiff was moved to the jail's medical dormitory (Answer to Comp., ¶ 23, Ex. 1, p. 53).

7. The plaintiff claims that he was involved in four altercations/fights on four separate dates between June 30-July 21 with four different inmates during his stint in the drunk tank (Ex. 1, pp. 27-45).

8. The plaintiff claims that he was kicked and punched during the first altercation by an unknown inmate but the plaintiff didn't suffer any injuries other than some bruising (Ex. 1, p. 29).

9. The plaintiff claims that he was kicked and punched during the second altercation by an unknown inmate and that his ribs and mouth were bruised after the second altercation (Ex. 1, pp . 35-36).

10. The plaintiff claims that he was punched during the third altercation by an unknown inmate and that he was bruised after the third altercation (Ex. 1, pp. 38-41).

11. The plaintiff claims that he was punched during the fourth altercation and that he received a bloody nose and bruised ribs during that altercation (Ex. 1, pp. 42-44)[3].

12. The plaintiff claims that he asked for medical attention after the fourth altercation and asked to be moved to another cell. In response, defendant Captain Carol Curwick moved the plaintiff to an adjacent holding cell and a nurse at the jail gave the plaintiff Tylenol and cleaned his nose (Ex.1, pp. 44-45). After the jail nurse attended to his injuries, the plaintiff was returned to the drunk tank (Ex. 1, p. 46).

13. At all relevant times, request/grievance forms were available at the jail, wherein inmates could complain about a matter, request medical attention or otherwise bring a matter or incident to the attention of jail officials (Ex. 1, p. 32).

14. At all relevant times, the plaintiff was aware that request and grievance forms were available to him and that he could bring a matter or problem to the attention of jail officials (Ex. 1, pp. 54-72).

15. Kankakee County does not have a record of the plaintiff submitting any request or grievance forms regarding any of the alleged four altercations described above.

16. On July 21, 2003, the plaintiff submitted a request form asking that a nurse look at his left finger (Ex. 1, pp. 54-55; Ex. 2). The request form was returned the same day to the plaintiff with a written response indicating that the plaintiff needed to fill out a sick call slip so the plaintiff could be seen. Id.

17. Upon receiving the written response from jail officials, the plaintiff did, in fact, fill out a "sick call" slip, indicating that he had a hurt finger and hand (Ex. 1, p. 56; Ex. 3).

18. The plaintiff did not state on the request form or the "sick call" slip that he had been beaten on any prior occasions or that he had ongoing injuries resulting from any prior altercation with an inmate, even though the plaintiff claims to have been struck by

---

[3]Kankakee County officials have no knowledge, documentation or information supporting the plaintiff's claims that he was struck by inmates on these first four occasions, but accept that these altercations happened for purposes of summary judgment only.

19. inmates inmates on numerous occasions during the preceding three weeks (Ex. 1, pp. 60-61).
20. On July 21, 2003, the plaintiff advised the jail's nurse that he hurt his left hand after punching a cell wall in anger (Ex. 4 - Jail Inmate's Medical Record). The plaintiff did not advise the nurse of any other injuries during his visit with the nurse. Id. Plaintiff was given an ice pack and medicine by the jail's nurse. Id.
21. On July 22, 2003, the plaintiff got into an alleged fifth and final altercation in the jail's holding cell (which is next to the jail's drunk tank), this time with an inmate named Laurice Love, who was in the holding cell at the time to use the phone (Ex. 1, pp. 46-49, 57-58). The plaintiff claims that Love punched and kicked him and that he suffered injuries to his head, nose and mouth because of Love's actions (Ex. 1, pp. 50-51).
22. After the altercation between the plaintiff and Love, correctional officers, including defendant Barb Dyer, took the plaintiff from the drunk tank and drove him to St. Mary's Hospital, where the plaintiff received three stitches in the back of the head and a splint for the plaintiff's wrist (Ex. 1, pp. 50-51; Ex. 5 - Dyer's report).
23. The plaintiff was x-rayed at St. Mary's Hospital. The x-rays were negative for fractures. He was treated for contusions, lacerations and a sprained wrist (Ex. 6 - St. Mary records, dated 7/22/03; Ex. 1, p. 60).
24. After the plaintiff received treatment at St. Mary's Hospital, he was returned to the jail's medical dormitory, where he remained until being transferred out of the Kankakee County jail on January 29, 2004 (Comp. ¶ 48; Ex. 1, p. 52).
25. After the incident with Love on July 22, the plaintiff indicated that he wanted to file charges against Love,. The jail officials forwarded the plaintiff's complaint to the Kankakee County State's Attorney's Office for review (Answer to Comp. ¶ 49; Ex. 1, pp. 58-59).
26. The plaintiff was never beaten by anyone during the six months that he remained housed in the jail's medical dormitory between January 22, 2003 and January 29, 2004 (Ex. 1, p. 52).
27. The plaintiff received medical attention in the medical dormitory (Ex. 1, p. 53).
28. The plaintiff received medicine in the jail after the altercation on July 22, 2003 between the plaintiff and Love (Ex. 7 - plaintiff's medication sheet).
29. The plaintiff was seen by medical or nursing personnel at the jail on various dates, including July 23, July 29, August 19, September 8, October 5, and October 8, 2003, for various medical matters including suture removal, a replaced crown (dental problems) and constipation (Ex. 4 - Jail Inmate's Medical Record; Ex. 1, pp. 59-60).
30. On January 29, 2004, the plaintiff was transferred from the Kankakee County Jail to the Illinois Department of Corrections. (Ex. 1, p. 7).
31. On August 25, 2003, the plaintiff complained in writing that he was not feeling good and requested aspirin. The plaintiff was advised in writing that he could order Tylenol or ibuprofen from the commissary but was in any event given ibuprofren in the interim (Ex. 8, plaintiff's request, dated August 25, 2003).
32. On October 2, 2003, the plaintiff asked in writing about his medication and about when stitches given to him by the jail's dentist would be removed (Ex. 9 - plaintiff' request, dated October 2, 2003). The plaintiff received a written response explaining that the

dental stitches would be removed a week after they were placed in his mouth. Id.
32. On October 4, 2003, the plaintiff complained in writing that he was constipated. In response, the plaintiff was given Milk of Magnesia by jail nurses (Ex. 10 - plaintiff's request, dated October 4, 2003).
33. On October 25, 2003, the plaintiff complained in writing about the fact that he never received his order of Jolly Rancher candies but that he instead received only "'fuckin' Atomic Fireballs" (Ex. 11 - plaintiff's request, dated October 25, 2003).
34. On August 20, September 1, October 6 and October 28, 2003, the plaintiff submitted written requests asking to use a "regular razor" and was given access to a razor (Group. Ex. 12).
35. The plaintiff never complained in any of these written requests described above about his alleged altercations in the drunk tank with other inmates or about any injuries received during the aforementioned altercations (Ex. 1, pp. 63-70, 73).
36. The plaintiff received a response to each request form that he filled out (Ex. 1, p. 75).

## Discussion

While there is a general duty to protect prisoners from violence at the hands of other prisoners, not every harm caused by another inmate translates into constitutional liability for the corrections officers and officials responsible for the prisoner's safety. *Farmer v. Brennan*, 51 1 U.S. 825,833-34, 114 S.Ct. 1970 (1994). In order for the plaintiff to prevail on a "failure to protect" claim, he must show that he was incarcerated under conditions posing a substantial risk of serious harm, and also that the defendants acted with "deliberate indifference" to that danger. *Id.*; *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999). Specifically, the plaintiff must first prove that prison officials were aware of a specific, impending and substantial threat to his safety, often by showing the plaintiff complained to prison officials about a specific threat to his safety. *Pope v. Shafer*, 86 F.3d 90,92 (7th Cir. 1996). A "mere possibility of violence" is not sufficient to impose liability on prison officials. *Estate of Davis v. Johnson*, 745 F.2d 1066, 1071 (7th Cir. 1984). Therefore, in order for the plaintiff to prevail on his failure to protect claim, the defendants must have been aware of a substantial risk that those who acted against the plaintiff would do so, yet the defendants failed to take any action. *Sanville v. McCaughtry*, 266 F.3d 724,733-34 (7th Cir.2001).

In *Miller v. Turner*, 26 Fed.Appx. 560 (7th Cir. 2001), the Seventh Circuit considered a case with fact similar to the instant case. In that case, a federal inmate. Miller, "who apparently made many enemies in the prison system" sued the Bureau of Prisons ("BOP"), alleging that BOP failed to protect him against several attacks by various other inmates even though Miller had been classified as a "separatee" from numerous other inmates. 26 Fed.Appx. at 561. Despite this classification, Miller was placed in the prison's general population and subsequently got into several fights with inmates over a period of months. *Id.* However, the Seventh Circuit indicated that Miller was the "victim of random acts of violence" and that BOP officials were therefore not constitutionally liable for the attacks. *Id.* at 563.

In the instant case, the plaintiff was arrested on June 30, 2003 by Kankakee City police.

He spent the next three weeks (from June 30, 2003 until July 22, 2003) in the drunk tank at the county jail until he was removed on July 22, 2003, after which time he remained at all relevant times in the jail's medical dormitory. The plaintiff claims that he was involved in five altercations or fights during his initial three week stint at the jail and that the defendants were deliberately indifferent to his medical condition. The undisputed facts belie the plaintiff's failure to protect claim since the plaintiff's account of the events during that time does not support a conclusion that the defendants were constitutionally required to transfer plaintiff out of his cell to protect him from getting into more fights. The plaintiff alleges that he was involved in four skirmishes or fights before July 22, 2003, while in the jail's drunk tank. However, the plaintiff does not even recall the names of the other inmates that were involved in these alleged skirmishes and the jail's records do not reflect that the plaintiff ever filed any written grievances or complaints about these four skirmishes. Additionally, the plaintiff is only claiming some bruising and in one case a bloody nose as a result of these first four skirmishes. This fact, when viewed collectively suggests that these skirmishes either never occurred or are exaggerated, since the plaintiff later submitted numerous requests to jail officials about various other mundane matters including dental problems, constipation, the plaintiff's inability to get a "regular razor" and the jail's provision of Jolly Rancher candies to the plaintiff when he had asked for "'fuckin' Atomic Fireballs." The plaintiff did not complain in any of these written requests that he had been beaten by other inmates or that he needed medical treatment as a result of these beatings. Furthermore, since all of the alleged altercations involved different inmates, this is not a case where the plaintiff needed to be kept separate from an "enemy" inmate. The fact that the various altercations all involved different inmates indicates that the defendants were not aware of a "specific, impending and substantial threat" to the plaintiff's safety. Awareness of a specific, impending and substantial threat to the plaintiff's safety is necessary to support a failure to protect claim. *Pope v. Shafer*, 86 F.3d 90,92 (7th Cir. 1996).

      Furthermore, it is undisputed that on July 21, 2003, the day before his "last" fight, but after the first four alleged altercations, the plaintiff submitted a written request asking the jail's nurse to look at his sore left finger. The plaintiff was seen by the jail's nurse that same day and the plaintiff was given an ice pack and medicine. While the plaintiff testified at his deposition that he does not recall why his finger was sore, the jail records indicate that the plaintiff advised the nurse that he hurt his finger after punching a cell wall in anger. Regardless as to how he hurt his finger, his request for medical attention on July 21 is more notable for what is not included rather than what the plaintiff wrote on his request. Namely, there is nothing in his written request or in the nursing notes of July 21 indicating that the plaintiff was complaining at that time about his fights in the drunk tank or about any injuries allegedly suffered by the plaintiff during the incidents.

      Although the facts do not definitively prove for purposes of summary judgment that these first four altercations did not happen, they cut against a finding that the defendants were deliberately indifferent to the plaintiff's safety. Since the plaintiff's injuries from these first four alleged skirmishes were either minor in nature or non-existent and since there was no indication that the plaintiff's physical well-being was in serious jeopardy in the drunk tank, this court cannot find that the defendants' decision to keep the plaintiff housed in the drunk tank for three

weeks was constitutionally infirm. Therefore, the plaintiff's claim that the defendants violated his due process rights when they failed to transfer him before July 22, 2003 and thereby failed to protect him from harm by other inmates fails. Summary judgment is granted in favor of the defendants.

If the plaintiff is claiming that the defendants failed to protect him after the "last" altercation, then that claim fails as well. Unlike the first four altercations, Kankakee County actually has a record of the fifth altercation, which involved a fight in the jail's holding cell on July 22, 2003 between the plaintiff and another detainee, Laurice Love. The plaintiff claims that Love punched and kicked him and that he suffered injuries to his head, nose and mouth because of Love's actions. After this altercation, various correctional officers, including defendant Barb Dyer, took the plaintiff from the drunk tank and drove him to St. Mary's Hospital, where the plaintiff received three stitches in the back of his head, a splint for his wrist and x-rays, which were negative for fracture. Upon his return from St. Mary's Hospital, the plaintiff was placed in the jail's medical dormitory, where he remained until being transferred out of the Kankakee County Jail on January 29, 2004. The plaintiff was never beaten by anyone during his extended stay in the jail's medical dormitory and he received medical attention and medication while housed in the medical dormitory. Given these facts, there is no question that the jail officials fulfilled their constitutional obligations during the plaintiff's stay in the medical dormitory. In sum, since the plaintiff has not shown that the defendants failed to protect him, summary judgment is granted in favor of the defendants.

Under the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 114 S.Ct. 1970, 1976 (1994). Among other things, these principles prohibit jail guards from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 US. 97, 104-05, 97 S.Ct. 285 (1 976). However, liability only results when a defendant exhibits deliberate indifference to an inmate's serious medical needs. *Estelle*, 429 U.S. at 103-04. Although the Eighth Amendment does not apply directly to pre-trial detainees such as the plaintiff, the Due Process Clause of the Fourteenth Amendment protects detainees under the same standard as the Eighth Amendment. *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000).

In order to establish an Eighth or Fourteenth Amendment claim under 42 U.S.C. §1983, a prisoner must satisfy a two-prong test: (1) the alleged deprivation must be objectively serious, and (2) the prison official must have a sufficiently culpable state of mind (i.e., the official must have acted with "deliberate indifference" to the inmate's health or safety). *Farmer*, 114 S.Ct. at 1977. When determining whether a medical need is "serious," a court should consider factors such as the severity of the medical condition, the potential harm that could result from a lack of medical care, and the actual harm caused by the lack of medical care. *Jones-Bey v. Conlev*, 144 F.Supp.2d 1035 (N.D.Ind. 2000), citing *Thomas v. Pate*, 492 F.2d 15 1, 158 (7th Cir. 1974), cert. denied, 41 9 U.S. 81 3 (1 974). A medical condition is considered "serious" if it may be "life threatening or pose a risk of needless pain or lingering disability if not treated at once." *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991). A failure to "dispense bromides for the

sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue - the sorts of ailments for which many people who are not in prison do not seek medical attention -does not violate the Constitution." *Id.* More specific to this case, the failure to call doctors whenever a prisoner suffers minor scrapes and bruises does not violate the Constitution. *See Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir.2000); *see also* Gutierrez v. Peters, 111 F.3d 1364, 1372 (7th Cir.1997). Further, if the officials are aware only of minor symptoms, like swelling, the plaintiff is not entitled to relief. *See Boyce v. Moore*, 314 F.3d 884, 890 (7th Cir.2002).

With respect to the second requirement, deliberate indifference entails something more than mere negligence or even gross negligence. *McGill v. Duckworth*, 944 F.2d 344,347 (7th Cir. 1991). Rather, "deliberate indifference means that the officials must want harm to come to the prisoner or at least must possess total unconcern for a prisoner's welfare in the face of serious risks." Id. The deliberate indifference standard is a subjective test. *Farmer*, 114 S.Ct. at 1979. Accordingly, a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. The "deliberate indifference" standard requires that there must be "actual knowledge" of an impending harm which the defendant consciously refused to prevent, though it would have been easy to do so. *Jackson v. Duckworth*, 955 F.2d 21,22 (7th Cir. 1992).

The plaintiff fares no better as to his claim that the defendants did not provide him with adequate medical care after being beaten by other inmates. Based on the foregoing, summary judgment is granted to the defendants on the plaintiff's claim that they failed to provide him with adequate medical care while he was incarcerated at the Kankakee County Jail. The undisputed fact is the plaintiff did receive appropriate medical care while he was detained in the Kankakee County Jail. Defendants can only be held liable for a constitutional violation if they failed to address a "serious" medical condition. As indicated above, it is not even clear that the plaintiff was actually involved in any altercations before July 22, 2003 as there are no records whatsoever supporting the plaintiff's allegations that he was involved in multiple scraps while incarcerated in the jail's drunk tank. However, assuming arguendo for purposes of summary judgment that the plaintiff was involved in various scraps while in the drunk tank between June 30 and July 21, there are no facts that show the plaintiff ever suffered any serious injuries that required immediate medical attention before the fight between the plaintiff and Laurice Love. The facts show the alleged injuries suffered by the plaintiff during the alleged initial altercations quickly resolved on their own. If the plaintiff was actually bruised or injured during his first weeks in the drunk tank, those injuries were apparently the type that a person would not seek professional medical treatment. Further those alleged injuries apparently resolved on their own by July 21, 2003, when the plaintiff saw the jail's nurse to complain about his self-inflicted injury to his hand. The plaintiff did not complain at that time about any bruising or other injuries and there is no evidence that the nursing staff documented any injuries at that time, other than the plaintiff's self-inflicted finger injury. While the plaintiff denies that he received any medical attention after his first three scraps, the plaintiff states that he asked for medical attention after the fourth

altercation.  According to the plaintiff, defendant Captain Carol Curwick responded by temporarily moving the plaintiff to an adjacent holding cell and a nurse at the jail gave the plaintiff Tylenol and cleaned his nose for the relatively minor injuries suffered.  Thus, no constitutional claim can lie based on the defendants' handling of the plaintiff's request for medical attention after the fourth alleged altercation in the drunk tank.

The plaintiff also has not shown that he did not receive appropriate medical care after his scrap on July 22, 2003 with Laurice Love.  To the contrary, the facts show that the jail officials acted with care, not deliberate indifference, after the plaintiff's altercation with Love. This care is reflected in the fact that the plaintiff was taken to St. Mary's Hospital by jail personnel, where he was x-rayed, received three stitches and was given a splint for his wrist.  After returning to the jail, the plaintiff was placed in the jail's medical dormitory, where he saw nurses on a regular basis and was given medication.  The plaintiff was seen by medical or nursing personnel on six separate dates between July-October 2003.  Meanwhile, the plaintiff's requests, which dealt mostly with mundane matters such as the plaintiff's constipation, his search for a regular razor and his failure to get a particular candy were all responded to by jail officials.  In none of these requests did the plaintiff complain of a serious medical condition or alert officials to a medical crisis.  Given this chronology of reasonable medical attention and appropriate responses by jail officials, it cannot be said that the defendants were deliberately indifferent to the plaintiff's serious medical needs.   Jail officials need not provide medical attention for the sort of bumps and bruises that the plaintiff allegedly suffered during his first few alleged altercations in the drunk tank.  Further, the plaintiff received appropriate medical care after his altercation in the holding cell with Laurice Love on July 22, 2003.  Therefore, the defendants are entitled to summary judgment on the plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs.

**It is therefore ordered:**

1. The defendants' motion for summary judgment, d/e 32, is granted.  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56.  The case is terminated.  The parties are to bear their own costs.
2. Any remaining matters are rendered moot.  The July 20, 2006 final pre-trial conference and August 7, 2006 jury trial are cancelled.
3. If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

    Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this 19th day of July 2006.

/s/ Michael P. McCuskey
_____
Michael P. McCuskey
United States District Judge